**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LARITA KURT, JOLENE KRAMER, FRANK BANISTER, CAROLYN BANISTER, DON BURDOCK, and CARLA BURDOCK, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | No. 19 C 4520 Judge John J. Tharp, Jr. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PLATINUM SUPPLEMENTAL INSURANCE, INC., WAYNE BRIGGS, TYLER BRIGGS, MEDICO CORP LIFE INSURANCE COMPANY, and GUARANTEE TRUST LIFE INSURANCE COMPANY, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Larita Kurt, Jolene Kramer, Carolyn Banister, Frank Banister, Don Burdock, and Carla Burdock have brought this action against defendants Platinum Supplemental Insurance, Inc., Wayne Briggs, Tyler Briggs, Medico Corp Life Insurance Company, and Guarantee Trust Life Insurance Company, alleging that the defendants devised, directed, participated in, or benefitted from a life insurance "twisting" scheme that targeted senior citizens in primarily rural communities. Each defendant has moved to dismiss the plaintiffs' claims: Guarantee Trust Life Insurance Company, for failure to state a claim [83]; Tyler Briggs, Wayne Briggs, and Platinum Supplemental Insurance, Inc., for failure to state a claim and lack of standing [86], [90]; and Medico Corp Life Insurance Company, for lack of personal jurisdiction [85]. Defendants Platinum Supplemental Insurance, Inc. and Tyler and Wayne Briggs also move to strike the plaintiffs' class allegations [82]. For the reasons stated below, defendants GTL and Medico Corp's motions are

granted; Tyler Briggs and Platinum's motion to dismiss is granted in part and denied in part; Wayne Briggs' separate motion to dismiss is denied; and the Briggses and Platinum's motion to strike class allegations is denied.

## BACKGROUND

Platinum Supplemental Insurance, Inc., is a Dubuque-based Iowa corporation that markets and sells insurance policies on behalf of insurance underwriters, primarily through door-to-door sales and with a special focus on reaching potential customers in rural communities. Third Am. Compl. ¶¶ 16-17. Wayne Briggs founded and is the current president of Platinum; his son, Tyler Briggs, works as a sales associate. *Id.* at ¶¶ 18-19. Both Wayne and Tyler Briggs reside in Galena, Illinois. *Id.*

From 2002 through 2015, Platinum had a Development and Exclusive Marketing Agreement with Guarantee Trust Life, an Illinois mutual legal reserve company that develops, underwrites, issues, and administers life and health insurance products. *Id.* at ¶¶ 39-40, 5. Under their agreement, Platinum and GTL jointly developed cancer, heart attack, stroke, and longer-term care supplemental medical insurance policies, and Platinum sold these GTL-underwritten products as GTL's exclusive agent. *Id.* at ¶¶ 39-40. Unlike comprehensive health insurance coverage, supplemental insurance policies are "sold on an individual basis and [are] designed to put cash in the patient's pocket upon the occurrence of a specific medical event"—like a cancer diagnosis or heart attack—"to help mitigate the costs, burdens, and other indirect expenses associated with diagnosis and treatment" of that medical event not otherwise covered by comprehensive insurance policies. *Id.* at ¶ 29. GTL's policies also included a "return of premium" benefit rider, which provided that, under certain circumstances, the supplemental insurance policyholder would be entitled to the return of premiums paid on the policy, less any benefits paid out during the policy term. *Id.* at ¶ 30. In the plan booklet, the benefit was described as follows:

2

> **Return of Premium** – We'll return all premiums paid (less any claims paid) at the end of **15 years**, or on the plan anniversary after you reach age 75 (whichever is sooner). If you are 65 or older when your plan is issued, we will return premiums at the end of **10 years** (less any claims). Benefits are payable only upon cancellation of the policy or death of the primary insured. Premiums will be returned provided your coverage is still in force.

*Id.* at ¶ 31. This policy, the plaintiffs allege, "guarantees that the policyholder will realize *some* minimum cash benefit in an amount equal to the total premium he or she pays into the policy," in either benefit payments for covered medical events, return of premium payments, or some combination of the two, depending on the insured's subsequent medical history. *Id.* at ¶ 32. The benefit is forfeited, however, if the insured either cancels the GTL policy or allows it to lapse. *Id.* at ¶ 33.

The relationship between GTL and Platinum deteriorated after GTL was named a party in several lawsuits "arising from misrepresentations Platinum agents made to customers regarding GTL's insurance products." *Id.* at ¶ 43. In one case, Platinum's conduct led to a $4 million punitive damage verdict against GTL that Platinum refused to indemnify it for, in violation of the terms of the parties' agreement. *Id.* at ¶ 43-44. GTL terminated the sales and marketing agreement effective July 17, 2015. *Id.* at ¶ 44.

Shortly after its agreement with GTL ended, Platinum entered new sales and marketing agreements with State Mutual Insurance Company, Inc., a Georgia insurance company, and Medico Corp Life Insurance Company, a Des Moines, Iowa-based corporation. *Id.* at ¶¶ 20-21. The plaintiffs allege that "[i]n response to the loss of GTL's business, and armed with a list of GTL policyholders, Platinum—at the direction of W[ayne] Briggs and with the assistance of T[yler] Briggs—endeavored to 'flip' each and every one of GTL's policyholders to policies issued by its new underwriting partner, Medico." *Id.* at ¶ 46. They did so, the plaintiffs claim, through "high pressure, door-to-door sales encounters" with GTL supplemental insurance policy customers

and a range of misrepresentations about Platinum's relationship with GTL, GTL's relationship with Medico, and the insurance products being sold, including that Platinum was "upgrading" existing GTL policies for its customers; that Platinum "is GTL," though their affiliation had been severed; that Medico had either merged with or been bought by GTL; that Platinum had the authority to cancel existing GTL policies; that GTL supplemental polices were "no longer available" or that GTL was "going out of business." *Id.* at ¶ 51(a)-(j). Sales representatives also omitted the crucial fact that the insured's decision to cancel their existing GTL policy "would cause the policyholder to forfeit his or her return of premium benefit" and "otherwise obscure[ed], conceal[ed], or deceiv[ed] policyholders about the consequences of cancellation on their return of premium benefits." *Id.* When sales representatives' tactics paid off, GTL alleges, Platinum was rewarded two-fold: first, with the satisfaction of having successfully "flipped" a GTL customer to Medico, and second, with a "first year" commission for the agent from the sale of a new policy. *Id.* at ¶ 36.

The plaintiffs in this case are alleged victims of Platinum's multi-state "twisting"[1] scheme. Larita Kurt, an 80-year-old resident of Monticello, Iowa, paid more than $46,700 in premiums under her GTL Long-Term Care Insurance Policy between 2002 until 2017, when she terminated it and forfeited her right—and that of her daughter, Jolene Kramer, the named beneficiary—to any benefit under the policy's return of premium rider. *Id.* at ¶¶ 9-10. Frank Banister and his wife, Carolyn, of Hartford, Kansas, had a GTL Cancer/Heart Attack/Stroke Policy with a return of premium rider from 2008 until 2017. *Id.* at ¶ 12. Mr. Banister had paid GTL more than $21,400 in

---

[1] The plaintiffs use "twisting" as "a term of art used in the insurance industry to describe a practice by which an insurance agent uses material misrepresentations and omissions to induce a policyholder to cancel his or her existing policy and purchase a new policy with a new carrier." Third Am. Compl. at ¶ 35.

premiums at the time the policy was terminated. *Id.* Carla Burdock, a 75-year-old resident of Keswick, Iowa, was protected under a GTL Cancer/Heart Attack/Stroke Policy with a return of premium rider until 2017. *Id.* at ¶¶ 13-14. She forfeited more than $51,000 in policy premiums when she terminated her policy. *Id.* at ¶ 14. Her husband, plaintiff Don Burdock, was the named beneficiary under the policy. *Id.* All three of the insureds allege that they were "duped" into terminating their GTL supplemental policies by Platinum and its agents. *See id.* at ¶¶ 9, 12, 14; *see also id.* at ¶¶ 53-56. They also allege that Platinum engaged in the same high-pressure twisting scheme with customers across Arkansas, Colorado, Iowa, Illinois, Kansas, Minnesota, Missouri, Nebraska, Oklahoma, South Dakota, Texas, Wisconsin, and Wyoming, among others. *Id.* at ¶¶ 48, 57-76.

Based on the alleged conduct, the plaintiffs have filed a putative class action against Platinum, Wayne and Tyler Briggs, Medico Corp Life Insurance Company, and Guarantee Trust Life Insurance Company. The complaint includes 9 counts as to Platinum, Wayne and Tyler Briggs, and Medico Corp, outlining a variety of legal theories by which they seek damages from these defendants. They assert fraudulent misrepresentation (Count I), fraud by concealment, silence, or omission (Count II), negligent misrepresentation (Count III), negligence per se (Count IV), violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (Count V), and the Illinois statute regarding financial exploitation of elderly persons, 720 ILCS 5/17-56 (Count VI), tortious interference with contract (Count VII), civil conspiracy (Count VIII), and unjust enrichment (Count IX). In Count X, the plaintiffs bring a separate unjust enrichment claim against GTL. Each defendant has moved to dismiss under Rule 12(b) for lack of standing, lack of personal jurisdiction, or for failure to state a claim. The Briggs defendants and

Platinum also separately move to strike the plaintiffs' class allegations. Those motions are taken in turn.

## DISCUSSION

### 1. The Plaintiffs Failed to State a Claim Against Guarantee Trust Life.

The plaintiffs raise just one unjust enrichment claim against Guarantee Trust Life Insurance Company. They argue that GTL has unfairly benefitted through "its retention [of the] aggregate premiums paid by the Plaintiffs and the Class Members while disavowing the very obligations for which Plaintiffs and the Class Members paid premiums," and contend that, because the plaintiffs were "operating under mistakes of material fact" at the time they cancelled their GTL policies, "equity requires that GTL disgorge the benefits GTL has retained as a result" of Platinum's deceptive conduct. Third Am. Compl. ¶¶ 154-156. GTL counters that, taking the plaintiffs' allegations as true, it is "just as much a victim" of Platinum's conduct as the plaintiffs are—and, both because the plaintiffs' claims for damages are speculative and because a specific contract governed GTL's obligations to the plaintiffs—the doctrine of unjust enrichment has no application under Illinois, Iowa, and Kansas law and so the plaintiffs' claim should be dismissed. GTL Memo. Supp. Mot. Dismiss 2, ECF No. 84.

A Rule 12(b)(6) motion tests the sufficiency of a plaintiff's claim; it requires the court to assess whether a litigant has "state[d] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bhalerao v. Ill. Dep't of Fin & Prof'l Regulations*, No. 11 C 7558, 2012 WL 5560887, at *2 (N.D. Ill. Nov. 15, 2012) ("A motion to dismiss pursuant to 12(b)(6) tests the sufficiency of the complaint, not the merits of the case."). At this early stage of the proceedings, the Court must accept as true well-pleaded facts and draw reasonable inferences in favor of the plaintiffs. *See Ezekial v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

Illinois, Kansas, and Iowa law are all conceivably applicable to the plaintiffs' unjust enrichment claim against Guarantee Life;[2] GTL argues that the plaintiffs have failed to state a claim for relief no matter which law applies. To recover under an unjust enrichment theory in Illinois, "plaintiffs must show that [a] defendant voluntarily accepted a benefit which would be inequitable for [it] to retain without payment." *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992). Illinois courts describe unjust enrichment as "an equitable remedy based upon a contract implied in law" that is "only available when there is no adequate remedy at law." *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. Ct. App. 2004). And "[w]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Id.* (citing *E & E Hauling, Inc.*, 607 N.E.2d at 177); *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) ("In Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant."); *Sevugan v. Direct Energy Servs., LLC*, No. 17 C 6569, 2018 WL 2267806, at *8 (N.D. Ill. May 17, 2018) (dismissing an unjust enrichment claim where the plaintiff acknowledged in his complaint that a contract existed between him and the defendant but that the defendant "unjustly enriched itself and received a benefit beyond what was contemplated in the contract").

The same is true in Iowa and Kansas. The Iowa Supreme Court has defined the "three basic elements" of unjust enrichment as: "(1) enrichment of the defendant, (2) at the expense of the plaintiff, (3) under circumstances that make it unjust for the defendant to retain the benefit." *Endress v. Iowa Dep't of Human Servs.*, 944 N.W.2d 71, 80 (Iowa 2020); *see also Slade v. M.L.E. Inv. Co.*, 566 N.W.2d 503, 506 (Iowa 1997) ("A plaintiff seeking recovery under this doctrine must

---

[2] GTI is an Illinois company; plaintiffs Kurt and Burdock are Iowa residents and plaintiff Bannister is a Kansas resident.

prove the defendant received a benefit that in equity belongs to the plaintiff."). But, as in Illinois, "[t]here cannot be both an express contract and an implied in law contract for the same thing existing at the same time." *Irons v. Comm. State Bank*, 461 N.W.2d 849, 855 (Iowa Ct. App. 1990) (noting that contracts implied in law are obligations imposed by the law "without regard to either party's expression of assent either by words or acts"; contracts implied in law, or quasi contracts, are "imposed by law to prevent unjust enrichment"); *see also Giese Const. Co. v. Randa*, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994) ("One who pleads an express oral contract cannot ordinarily recover under an implied contract or quantum meruit. . . . An express contract and an implied contract cannot coexist with respect to the same subject matter, and the law will not imply a contract where there is an express contract."). Kansas law is substantially the same. *See, e.g.*, *Midwest Asphalt Coating, Inc. v. Chelsea Plaza Homes, Inc.*, 243 P.3d 1106, 1110 (Kan. Ct. App. 2010) (describing "unjust enrichment/quantum meruit" as rooted in a "promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to that person" and noting that "[r]ecovery for payment under the terms of a contract and recovery for quantum meruit are mutually exclusive legal concepts"—for a party to recover in equity despite the existence of a written contract, "the contract must have been unenforceable").

Because there were valid, written contracts governing GTL's relationship with each of the plaintiffs—including detailed provisions outlining the eligibility criteria for policyholders to receive the return of benefit premium—GTL argues that the plaintiffs do not, as a matter of law, have an unjust enrichment claim against it. The plaintiffs do not dispute the existence or validity of their written contracts, but raise two arguments to support their claim: first, that "it was the termination of Plaintiffs' contractual relationship with GTL that gave rise to their unjust enrichment claims and, thus, no enforceable contract governed their relationship during the

relevant time frame"; and, second, that "no terms of the GTL policies governed the particular subject matter at issue in Plaintiffs' unjust enrichment claim." Pls.' Resp. Opp'n at 5. Neither argument is persuasive.

First, the plaintiffs contend that the unjust enrichment claims arose after the end of their contractual relationships with GTL and "principally depend[] on the termination (*i.e.*, the *non-existence*) of GTL's contractual obligations to Plaintiffs." *Id.* at 6 (emphasis in original). And the plaintiffs cite a case from this district, *Industrial Hard Chrome, Ltd. v. Hetran, Inc.*, to counter the notion that the existence of a written contract between parties precludes an unjust enrichment claim. 90 F. Supp. 2d 952, 957 (N.D. Ill. 2000). But as GTL notes, that case is easily distinguishable. In *Hetran*, the counterclaimant "provided the counter-defendants with on-site training and service" after the expiration of the original, governing contract, such that the counterclaimant provided labor and service above and beyond what the parties had originally contracted for. *Id.* at 957-58. In this case, however, neither the plaintiffs nor GTL provided the other with payment, goods, or services after the plaintiffs formally terminated the parties' contractual relationship. *See* GTL's Reply 4, ECF No. 116 ("The plaintiffs here make no allegation that they continued to pay premiums to GTL *after* they were induced to terminate their policies. Nor do they allege that they performed any other act *after* the termination of their policies that conferred a benefit on GTL, which was wrongly retained."). As a result, unlike in *Hetran*, neither party conferred a benefit on the other outside the temporal bounds of their contractual relationship.

Perhaps recognizing this shortcoming, the plaintiffs alternatively argue that even if the express contract still "remained in effect" when the unjust enrichment claim arose, the contract did not speak to "the allocation of benefits and losses occasioned by the twisting conduct of third parties"—and, as a result, the existence of the contract does not conflict with or foreclose their

equitable claim. Pls.' Resp. Opp'n at 6-7. But again, as GTL notes, this argument is non-credible. The contract between the parties clearly outlined when, and under what circumstances, the plaintiffs would be entitled to the return of their supplemental insurance premiums paid less any costs GTL incurred for their care. *See* Third Am. Compl. at ¶ 31 (citing GTL's plan booklet, which informed policyholders that they would be entitled to the return of their premiums "at the end of **15 years** or on the plan anniversary after you reach age 75 (whichever is sooner)" or, if the policyholder was 65 or older when the plan was issued, "at the end of **10 years**"). Though they frame it as an issue of "the allocation of benefits and losses" stemming from a third parties' allegedly fraudulent behavior, what the plaintiffs ultimately seek is "the return of the premiums they paid for prior to terminating their policies," GTL's Reply at 4, a possibility expressly governed by that contractual provision and conditioned on the policyholder's coverage remaining "in force" when the policyholder became eligible according to GTL's terms. Third Am. Compl. at ¶ 31 ("Benefits are payable only upon cancellation of the policy or death of the primary insured. Premiums will be returned provided your coverage is still in force.").

Unjust enrichment "is a means of recovering something that the defendant is not entitled to but is unfairly possessing to the plaintiff's detriment." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 520 (7th Cir. 2011). Based on the allegations in the plaintiffs' complaint, whether GTL was entitled to retain the plaintiffs' premium payments was clearly governed by the parties' written, enforceable contract—and the existence of that contract precludes an unjust enrichment claim here under Illinois, Kansas, and Iowa law. As a result, GTL's motion to dismiss for failure to state a claim is granted.

### 2. This Court Does Not Have Personal Jurisdiction over Medico Corp Life Insurance Company.

Next, defendant Medico Corp has moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. Medico Mot. Dismiss, ECF No. 85. In support, Medico notes that the plaintiffs' claims are "based on representations made by an Iowa insurance agency in Iowa and Kansas," "[n]o alleged injury occurred in Illinois," "Medico [is] incorporated and headquartered in Iowa," and "Illinois supplies just 2.3% of the total premiums generated by [Medico's] insurance business that spans 44 states and the District of Columbia." Medico Corrected Memo. Supp. 1, ECF No. 112. As a result, Medico argues that subjecting it to personal jurisdiction in Illinois would "violate its federal due process rights and exceed the territorial limits of the state's power." *Id.* The plaintiffs counter that Medico has sufficient contacts with the forum state because it targets Illinois customers and has "several thousand" active policies in the state, such that Medico is "on notice of being haled into court" in Illinois. Pls.' Resp. Opp'n 9, 12, ECF No. 104. The plaintiffs also point to their allegations that Platinum and individuals Wayne and Tyler Briggs "acted as Medico's agents with respect to the sale of Medico's policies in the twisting scheme against GTL policy holders in Illinois." *Id.* at 8-9. Finally, the plaintiffs argue that Medico has such continuous and systematic contacts with Illinois as to render the company "essentially at home" there, such that Illinois has general personal jurisdiction over it. *Id.* at 13.

The plaintiffs have "the burden of establishing personal jurisdiction, and where, as here, the issue is raised by a motion to dismiss and decided on the basis of written materials rather than an evidentiary hearing, the plaintiff[s] need only make a prima facie showing of jurisdictional facts." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). At the motion to dismiss stage, all well-pleaded facts in the complaint are taken as true and factual disputes are resolved in the plaintiffs' favor. *Id.* When a court sits in diversity, "personal jurisdiction is governed by the law

of the forum state"; Illinois' long-arm statute "permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause," so this Court's inquiry is focused on whether Medico has sufficient minimum contacts with the state of Illinois such that maintenance of this suit in this forum does not offend traditional notions of fair play and substantial justice. *Id.*

The plaintiffs urge that this Court has both general and specific personal jurisdiction over Medico Corp. A court has general jurisdiction over "any and all claims" brought against a corporation if it is either domiciled in the forum—i.e., it is incorporated or maintains its principal place of business in the forum—or if the corporation's contacts with the forum state are so continuous and systematic that the corporation can otherwise be considered "at home" there. *See Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024 (2021); *Tamburo*, 601 F.3d at 701. "The threshold for general jurisdiction is high," and a nonresident corporation's contacts must be "sufficiently extensive and pervasive to approximate physical presence" for a court to exercise general jurisdiction over claims against it. *Tamburo*, 601 F.3d at 701. "Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford*, 141 S. Ct. at 1024. Specific jurisdiction may be appropriate if a defendant has purposefully availed itself of the privilege of doing business or conducting activities in the forum state; even if a defendant has deliberately reached into the forum, however, "[t]he plaintiff's claims . . . must arise out of or relate to the defendant's contacts with the forum." *Id.* at 1025 (internal quotations omitted) (citing *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017)).

The plaintiffs' contention that Medico is subject to general personal jurisdiction in Illinois is disposed of easily. As Medico Corp notes and the plaintiffs concede, Medico is an Iowa

corporation with an Iowa principal place of business. *See* Medico Corrected Memo. Supp. at 1, Ex. A; Third Am. Compl. ¶ 20 ("Defendant Medico is an Iowa corporation . . . with its principal place of business located in Des Moines, Iowa."). And though the exercise of general jurisdiction is not limited to these paradigmatic forums, it is an "exceptional case" where a corporate defendant's operations in a forum other than that of incorporation or its principal place of business are "so substantial and of such a nature as to render the corporation at home in that State." *Livingston v. Hoffmann-La Roche Inc.*, 293 F. Supp. 3d 760, 766 (N.D. Ill. 2018). This is not that case. Medico has "almost no physical presence in the state"—it has never maintained an office here, has never owned or leased real property in Illinois, and has never had an Illinois telephone number or mailing address. Medico Corrected Memo. Supp. at 3, Ex. A. Illinois workers have never accounted for more than 3% of Medico's workforce. *Id.* at 8, Ex. A. Its business is not uniquely targeted at Illinois; rather, Medico is "licensed to provide insurance in 44 states and the District of Columbia." *Id.* at 8, Ex. A. And of its 92,860 active insurance policies, "[o]nly 2,375 . . . are in Illinois, making up only 2.56% of all of [Medico's] active insurance policies." *Id.* Appraising Medico's activities in their entirety, as this Court must, it is clear that Medico is not any more "at home" in Illinois than it is in any other state where it sells its insurance products— and "a corporation that operates in many places can scarcely be deemed at home in all of them." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017). While Medico's contacts with the state may suffice to establish specific personal jurisdiction for some claims, its in-state business is not enough to permit the assertion of general jurisdiction over out-of-state claims that a plaintiff may bring.

Medico's Illinois contacts do not permit the exercise of specific jurisdiction over the plaintiffs' claims, either, because the non-resident plaintiffs' injuries do not arise from or relate to

non-resident Medico's Illinois activities. The plaintiffs argue that "every time Defendant Medico enters into an insurance contract . . . to provide insurance benefits within the state," the possibility arises that it, like other insurers, might be "haled into court in the state," and as such Medico has been on notice of being sued in Illinois, where it actively sells policies on a door-to-door basis. Pls.' Resp. Opp'n 12-13. For a court to exercise specific jurisdiction, however, there "must be an affiliation between the forum and the underlying controversy, principally an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (cleaned up). And when "there is no connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* at 1781; *see also Goodyear Dunlop Tire Operations, S.A. v. Brown*, 564 U.S. 915, 923, 930 n.6 (2011) (noting that courts may exercise jurisdiction over out-of-state defendants where the corporation's in-state activity is continuous and systematic and "*that activity gave rise to the episode-in-suit*" and that "even regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales"). Such is the case here. The plaintiffs' alleged injuries arose from Platinum's agents' sale of Medico-underwritten supplemental insurance policies in Hartford, Kansas, and Keswick and Monticello, Iowa—those injuries are entirely unrelated to Medico's 2,375 active insurance policies in the state of Illinois. *Compare Bristol-Myers Squibb*, 137 S. Ct. at 1782 ("The relevant plaintiffs are not California residents and do not claim to have suffered harm in that State. In addition, as in *Walden*, all the conduct giving rise to the nonresidents' claims occurred elsewhere. It follows that the California courts cannot claim specific jurisdiction."). Even assuming everything alleged in the complaint is true, Medico had no reason to think that it would be brought to court in Illinois to adjudicate Kansas- and Iowa-centric claims arising from out-of-state plaintiffs' supplemental insurance policies.

The plaintiffs' allegations that Wayne and Tyler Briggs, both Illinois citizens, "acted as Medico's agents with respect to the sale of Medico's policies generally and superficially with respect to the twisting scheme" does not change this analysis. Pls.' Resp. Opp'n at 9 (citing Third Am. Compl. at ¶ 48). It's true that an agent's contacts with the forum may be relevant to the determination of specific jurisdiction—the Supreme Court has observed, for example, that a "corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there" on its behalf. *Kolcraft Enters., Inc. v. Artsana USA, Inc.*, No. 13 C 4863, 2014 WL 3865814, at *4 (N.D. Ill. Aug. 6, 2014) (quoting *Diamler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014)). So a nonconclusory allegation that Medico's agents acted in the forum, at Medico's direction, would be considered a relevant contact in determining whether Medico has sufficient contacts with the state to make the exercise of specific jurisdiction appropriate. But the obstacle for plaintiffs' assertion of specific jurisdiction is not that Medico has insufficient contacts with the state of Illinois—it likely has sufficient contacts, at least as to some sorts of claims, given the level of business it conducts in the state—but that the plaintiffs' specific claims do not arise out of those contacts. The allegations regarding Wayne and Tyler Briggs do not cure that deficiency: the plaintiffs' injuries no more arise out of the fact that the Briggses reside in Illinois than they do out of the several thousand insurance contracts that Medico has sold to other customers in Illinois.

Finally, though they do not assert the argument clearly, the plaintiffs suggest that this Court has specific jurisdiction over Medico based on "instances of the scheme specific to Illinois Class Members." Pls.' Resp. Opp'n at 6. The plaintiffs' complaint alleges at least two episodes in 2018 in which Platinum sales agents visited GTL policyholders in Illinois and attempted to convince those individuals to terminate their GTL policies. *Id.* at 7 (citing Third Am. Compl. at ¶¶ 70, 71, 74). In at least one of those episodes, the policyholder "purchased the new policy" (presumably a

Medico-underwritten policy, as alleged elsewhere). Third Am. Compl. at ¶ 71. Unlike the Kansas-and Iowa-based named plaintiffs, these putative class members' injuries allegedly occurred in Illinois and could potentially provide the critical link between Medico's Illinois-based business and a plaintiff's Illinois-based claim related to that business.

But as Medico points out, this Circuit's precedent is clear that "[s]pecific personal jurisdiction can arise only from the claims of the named plaintiffs, not those of absent class members"—when "a district court does not have jurisdiction over the claim of the class representative[s] . . . it has no jurisdiction over the class action either even if the claims of some of the members of the class were within its jurisdiction." *Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 866 (N.D. Ill. 2016) (alterations omitted) (citing *Denberg v. U.S. R.R. Ret. Bd.*, 696 F.2d 1193, 1197 (7th Cir. 1983)). Pre-*Bristol-Myers Squibb*, in cases "relying on specific jurisdiction over the defendant, minimum contacts, purposeful availment, and relation to the claim were assessed only with respect to the named plaintiffs." *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 445 (2020). Whatever *Bristol-Myers*' impact is on due process requirements in federal nation-wide class actions, the Court's decision did not change that "named representatives must be able to demonstrate either general or specific jurisdiction" in the forum court over their claims against a particular defendant. *Id.* at 447. The plaintiffs cannot do that here, and so Medico's motion to dismiss for lack of personal jurisdiction is granted.

### 3.  At Least Some Claims May Proceed Against the Briggses and Platinum.

Finally, individual defendants Tyler and Wayne Briggs and defendant Platinum Supplemental Insurance Company have moved to dismiss most of the plaintiffs' complaint under Rule 12(b)(1), arguing that at least some of the plaintiffs do not have standing to pursue their claims, and under Rule 12(b)(6), for failure to state a claim. T. Briggs & Platinum Mot. Dismiss,

16

ECF No. 86, W. Briggs Mot. Dismiss 1, ECF No. 90 (joining Tyler Briggs' and Platinum's motion as well).[3] Tyler Briggs and Platinum do not contest the adequacy of the allegations supporting Counts I, II, III, or IX, as they pertain to plaintiffs Larita Kurt and Jolene Kramer. *See* T. Briggs & Platinum Mot. Dismiss at 15. But, as to the other plaintiffs and the remaining counts, the defendants' arguments are varied. They contend that: the Burdock and Banister plaintiffs do not have standing under Article III because they have not alleged a concrete, particularized injury; their damages are too speculative to warrant relief under any claim premised on the return of premium benefit; the Illinois Consumer Fraud Act and the Illinois Financial Exploitation of an Elderly Person Act do not have extraterritorial application; and the plaintiffs have not plausibly alleged tortious interference with contract, civil conspiracy, or negligence per se claims. Those arguments are considered in turn.

<blockquote>a. <u>The Banister and Burdock Plaintiffs' Have Adequately Alleged Standing and Damages.</u></blockquote>

First, Platinum and the Briggses argue that the "Banister and Burdock Plaintiffs cannot plausibly allege . . . that any of them would have received their ROP [return of premiums] but for Defendants' actions" and that their alleged "speculative future injury is insufficient to confer Article III standing." T. Briggs & Platinum Memo. Supp. 4, ECF No. 87. Neither Frank Banister nor Carla Burdock (or their respective beneficiaries) were eligible for the return of premium benefit at the time they terminated their GTL policies; even if they had not terminated those policies, the defendants argue, "the damages Plaintiffs allege are contingent on 'future events' that may never

---

[3] In his separate motion to dismiss, Wayne Briggs "join[ed] and incorporate[d] . . . the arguments made by co-defendants Platinum Supplemental Insurance, Inc. and Tyler Briggs" in their motion to dismiss. W. Briggs Memo. Supp. 1 n.1, ECF No. 91. He also made arguments about why the claims failed against him, individually; those arguments are examined in the next section.

occur" and "their possible ROP will be reduced if not depleted altogether" if the plaintiffs experienced covered medical events before they became eligible for their premiums to be returned. *Id.* at 5-6.[4] As a result, the defendants urge that the plaintiffs' principal damages claim—"that they lost the opportunity to one day possibly cash in on a "Return of Premium" ("ROP") benefit"—is far too speculative to satisfy Article III's requirements.

"To invoke the jurisdiction of a federal court, a plaintiff must demonstrate that he has standing to sue, a requirement 'rooted in the traditional understanding of a case or controversy,'" as that language is used in Article III. *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1063-64 (7th Cir. 2020). And "[t]o establish standing, a plaintiff has the burden to establish that he has '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial ruling.'" *Id.* at 1064 (citation omitted). Many disputes about standing, as here, turn on the "injury in fact" requirement, which requires a plaintiff to show that they suffered, or are in danger of suffering, "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (citation omitted).

Defendants are correct that courts in this district have held that "[u]nder Article III, a court may not address claims 'if they are grounded on contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *See, e.g., Brandt v. Vill. of Winnetka*, No. 06 C 588,

---

[4] By contrast, plaintiff Larita Kurt suffered a heart attack on December 27, 2018, about a year and half after defendant Tyler Briggs allegedly duped her into terminating her GTL policy and unwittingly purchasing a new supplemental policy underwritten by Medico. Third Am. Compl. at ¶ 54. Medico refused Ms. Kurt's claim for benefits on the basis that she failed to disclose an untreatable preexisting heart condition in her application. *Id.* Larita's husband, Karl, was also formerly insured by GTL, and he cancelled his policy at the same time Larita did. *Id.* Mr. Kurt passed away on January 15, 2018, at the age of 78; his beneficiary, the couple's daughter Jolene Kramer, would have been eligible for a return of premiums under the GTL policy had it not been cancelled before Mr. Kurt's death. *Id.*

2009 WL 3187614, at *5 (N.D. Ill. Sept. 30, 2009) (quoting *Corey H. v. Bd. of Educ.*, 534 F.3d 683, 689 (7th Cir. 2008)). But the plaintiffs' claims differ in an important way from those in *Brandt* and *Corey H.*. In this case, the factual predicate for the plaintiffs' injuries has (allegedly) already occurred—they were lied to (either expressly or by omission), those lies successfully induced them to switch their supplemental insurance, and, as a result, they forfeited their return of premium benefit under their GTL policies. In the defendants' cited cases, on the other hand, there were significant questions regarding whether the factual predicate for the plaintiffs' forecasted injuries would occur at all. *Compare Corey H.*, 534 F.3d at 689 (explaining that the Chicago School Board would suffer an injury from the 20% enrollment cap "only if the schools were not granted waivers from the cap—an event that has yet to occur"); *Brandt*, 2009 WL 3187614, at *6-7 (challenge to city ordinance allowing security fees to be charged to residences hosting high-profile political events was not ripe because it was unclear whether or when the plaintiff would host a covered event, if the ordinance would still be in place at that time, or whether the city would be required to provide additional security; analyzed as a standing issue, the plaintiff had not demonstrated he had suffered an injury that was "more than speculative"). The defendants' arguments ignore that "[i]njury-in-fact for standing purposes is not the same thing as the ultimate measure of recovery"— [t]he fact that a plaintiff may have difficulty proving damages does not mean that he cannot have been harmed." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013). Here, the plaintiffs allege that they lost a valuable contractual right and that loss is sufficiently particularized and concrete to confer standing.

The defendants re-up their arguments about the speculative and contingent nature of the plaintiffs' injuries to alternatively contend that, even if the plaintiffs have standing, they have not adequately stated a claim under Rule 12(b)(6). They also claim that the Banister and Burdock

plaintiffs' "conclusory requests" for damages "due to 'additional sums' for 'replacement policies' and 'emotional distress' are completely devoid of any factual support." T. Briggs & Platinum Memo. Supp. at 9-11. Neither argument is persuasive, and, again, the cases the defendants cite are inapposite. It's true that damages for breach of contract or for tort are limited to those that are both "proximately caused by the defendant's wrongful conduct" and, in contract cases, foreseeable at the time a contract was formed and provable with reasonable certainty. *Vacuum Indus. Pollution, Inc. v. Union Oil Co.*, 764 F. Supp. 507, 511-12 (N.D. Ill. 1991). As a result, "purely speculative damages" cannot be recovered. *Id.* at 512. In *Vacuum Industrial*, for example, the court held that the plaintiff could not recover damages for injuries far removed from the defendant's breach of contract, none of which were proximately caused by the defendant's breach nor calculable with reasonable certainty: "financial losses, the collapse of its business, the loss of future business, [or] the loss of favorable insurance policies." *Id.* But the plaintiffs' allegations are different. There is no question that, by cancelling their GTL policies at the defendants' prompting, the plaintiffs forfeited their return of premium benefit. And for all the defendants' talk of "contingencies," the GTL plan booklet outlines only one criterion for receiving the benefit: maintaining coverage for an adequate amount of time. *See* Third Am. Compl. at ¶ 31. The complaint indicates Ms. Burdock would be eligible for the benefit now, *see id.* at ¶ 13 (noting Ms. Burdock is 75-years old), and that Mr. Banister will be shortly, *id.* at ¶ 11 (noting Mr. Banister is 71-years old), and does not indicate that either policyholder suffered a qualifying medical event that would diminish the value of the benefit. So, at this stage, the only question is the dollar value of the benefit, and that question can presumably be answered through an accounting of the premiums each plaintiff paid toward their policies prior to cancellation, expenses paid under the policy prior to cancellation, and a probabilities-based forecasting of the premiums that would have been paid and likely expenses

had those policies not been cancelled. That uncertainty, despite defendants' protestations to the contrary, is not fatal to the plaintiffs' claims at this stage. *Cf. Beerman v. Graff*, 621 N.E.2d 173, 179 (Ill. Ct. App. 1993) ("While absolute certainty concerning the amount of damages is not necessary, the evidence must show a basis for its calculation with a fair degree of certainty. . . . Damages are speculative when uncertainty exists as to the fact of damages, rather than to the amount of such damages").

Because the Banister and Burdock plaintiffs have standing and have adequately alleged injuries due to the defendants' misrepresentations, the defendants' concession that Counts I, II, III, and IX are otherwise adequately pleaded and should not be dismissed will apply with equal force to all plaintiffs.

b. <u>The Plaintiffs Cannot Bring Illinois Statutory Claims.</u>

However, the Briggses and Platinum argue that the plaintiffs cannot assert claims under two Illinois statutes: the Illinois Consumer Fraud Act and the Illinois Financial Exploitation of an Elderly Person Act. W. Briggs & Platinum Memo. Supp. at 11-12. The defendants stress that the "[p]laintiffs are not Illinois residents and the allegedly improper acts took place outside of Illinois" and that Illinois statutes are generally not applicable extraterritorially in the absence of clear legislative intent to the contrary. *Id.*

First, the Court agrees that the named plaintiffs do not have causes of action under the Illinois Consumer Fraud Act. The Illinois Supreme Court has held that a plaintiff may assert a claim under the Illinois Consumer Fraud Act "if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005). It acknowledged that "there is no single formula or bright-line test for determining whether a transaction occurs within this state," but examined, as relevant

circumstances, "where a company policy is created or where a form document is drafted," where the plaintiff resides, where the alleged deception took place, where the subject of the alleged fraudulent conduct was located, where damage occurred to the plaintiff, and where the plaintiff interacted with the defendant's agents or representatives. *Id.* at 854. And it concluded that "[f]our of the five named plaintiffs" in that putative car insurance fraud class action "ha[d] no cause of action under the Act" because they were not residents of Illinois, their cars were not damaged in Illinois, they did not receive repair estimates in Illinois, and they did not have their cars repaired in Illinois. *Id.* at 855.

The analysis is quite similar here. All three sets of plaintiffs reside out of state; Platinum, the defendant most directly responsible for the alleged fraud, is out of state; the company that underwrote the plaintiffs' new supplemental insurance policies is out of state; and the fraudulent statements themselves were made to plaintiffs in their homes in Kansas and Iowa. In the Court's view, the only relevant allegations the plaintiffs make linking their specific fraudulent transactions to the state of Illinois is that their cancellation letters terminating their previous GTL supplemental insurance policies likely would have been directed to GTL in Illinois. Surprisingly, the plaintiffs don't even rely on that fact—rather, they point to allegations that GTL is incorporated in Illinois; that the Briggses reside in Illinois; their standard venue allegations; and their claims that the Briggses and Platinum endeavored to "flip" each GTL policyholder into a Medico policyholder, that the Briggses acted as Medico's agent in a variety of states, including in Illinois, in the twisting scheme, and that Medico authorized Platinum to undertake the twisting scheme on their behalf. But none of these facts link the *plaintiffs'* injuries or the circumstances surrounding the *plaintiffs'* disputed transactions with Illinois. The plaintiffs' assertion that they "properly stated circumstances that the fraudulent twisting scheme occurred and [sic] substantially within Illinois,

22

even though the injuries may have occurred out-of-state injuries [sic]," Pls.' Resp. Opp'n 12, ECF

No. 105, is just not supported.

The plaintiffs do not have a cause of action under 720 ILCS 5/17-56 either, which in

relevant part prohibits the financial exploitation of an elderly person by an individual who "stands

in a position of trust or confidence" with the victim and knowingly obtains control over the victim's

property through deception or intimidation. In *Avery*, the Illinois Supreme Court began its analysis

with an acknowledgment of the "long-standing rule of construction in Illinois which holds that a

statute is without extraterritorial effect unless a clear intent in this respect appears from the express

provisions of the statute." *Avery*, 835 N.E.2d at 852 (internal quotations omitted); *see also, e.g.*,

*Motorola Solutions, Inc. v. Hytera Comms. Corp. Ltd.*, 436 F. Supp. 3d 1150, 1168 (N.D. Ill. 2020)

("An Illinois statute 'should not be given extraterritorial effect [if] it does not clearly appear

therefrom that such was the intention of the legislature.'") (citing *Butler v. Wittland*, 153 N.E.2d

106, 109 (Ill. App. Ct. 1958)). Whether 720 ILCS 5/17-56 has extraterritorial effect appears to be

a question of first impression, but nothing in the statute, which outlines both criminal and civil

penalties for committing the prohibited deceptive acts, suggests any legislative intent for the statute

to apply outside Illinois. *See Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir. 1996) (explaining

that, when faced with opposing interpretations of unsettled state law, federal courts "generally

choose the narrower interpretation which restricts liability, rather than the more expansive

interpretation which creates substantially more liability"). And, as with their claims under the

ICFA, the plaintiffs cannot plausibly allege that the circumstances of the alleged exploitation

"occurred primarily and substantially in Illinois"—the victims, the alleged exploiters, and the

deceptive acts all occurred elsewhere. *Cf. LG Electrs. U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp.

2d 857, 859-60 (N.D. Ill. 2011) (concluding, under *Avery*, that the Illinois Uniform Deceptive

Trade Practices Act does not have extraterritorial effect, and analyzing whether the statute was nonetheless triggered nationwide based on conduct occurring "substantially and primarily" in Illinois); *see also Stroman Realty, Inc. v. Allison*, 2017 IL App (4th) 150501-U, at ¶ 59 (2017) ("Without that clear intent, the statute has no extraterritorial force and is operative only as to persons or things within Illinois.") (internal quotations omitted).

c.  The Plaintiffs Have Not Plausibly Alleged a Tortious Interference with Contract Claim.

Next, the defendants argue that the plaintiffs have failed to state a cause of action for tortious interference with contract. The Court agrees. Taking the allegations in the plaintiffs' complaint as true, Platinum and its sales agents approached former GTL policyholders and made misrepresentations to induce those policyholders to cancel or otherwise breach their insurance contracts with GTL and purchase new, Medico-underwritten supplemental policies. Under Illinois law, however, the essential elements of a tortious interference claim are: "(1) [t]he existence of a valid and enforceable contract, (2) [t]he defendant's knowledge of the existing contract, (3) [i]ntentional and malicious inducement of the breach, (4) [t]he subsequent breach *by the third person* due to defendant's wrongful conduct, and (5) [d]amage to the plaintiff." *Mitchell v. Weiger*, 409 N.E.2d 38, 40 (Ill. Ct. App. 1980) (emphasis added); *see also LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 939-40 (N.D. Ill. 2007) (to make out tortious interference claim under Illinois law, a plaintiff must show that the defendant was aware of the plaintiff's contract with a third party and "intentionally and unjustifiably induced the other contracting party to breach it"; "Illinois law dictates that any tortious interference by a defendant, either with a contract or prospective business relationship, must have been directed toward the third party, not the plaintiff"). Because the plaintiffs do not allege that the defendants unjustifiably induced GTL

24

to breach its insurance contracts with the plaintiff policyholders, to their detriment, the plaintiffs have not plausibly plead a tortious interference claim.

### d. The Plaintiffs Have Not Plausibly Alleged a Civil Conspiracy Claim.

The defendants also argue that the plaintiffs' "conclusory allegation that 'Platinum, Briggs, and Medico entered into an agreement to achieve by concerted action the unlawful purposes alleged herein and/or to achieve lawful purposes by unlawful means alleged herein'" is insufficient to plausibly plead a cause of action for civil conspiracy. T. Briggs & Platinum Memo. Supp. at 13 (citing Third. Am. Compl. at ¶ 143). The plaintiffs dismiss the defendants' attack on the sufficiency of their allegations as an overstatement of the plaintiffs' pleading burden and maintain that "the coordination necessary to enact the fraudulent twisting scheme over several years and several states" is sufficient circumstantial evidence for the claim to proceed to discovery. Pl.'s Resp. Opp'n at 14.

The plaintiffs have not plausibly plead a cause of action for civil conspiracy for two reasons: first, under the intracorporate conspiracy doctrine, "there can be no civil conspiracy between a corporation's own officers or employees . . . nor between a corporation and its agents," *Georgeson v. DuPage Surgical Consultants, Ltd.*, No. 05 C 1653, 2005 WL 1799281, at *2 (N.D. Ill. July 26, 2005), and second, because the plaintiffs' allegations regarding Medico's involvement in the alleged conspiracy are too conclusory for the conspiracy claim to survive a motion to dismiss. Under Illinois law, "civil conspiracy consists of 'a combination of two or more persons for the purpose of accomplishing, by some collaborating action, either an unlawful purpose or a lawful purpose by unlawful means.'" *Id.* (citing *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1994)). On their face, the plaintiffs' allegations implicate at least three different parties: Platinum, Wayne Briggs, and Medico. But upon a closer look, those allegations come up short. Allegations

that there was an agreement between Platinum and Wayne Briggs—or between Platinum and any other of its sales agents who allegedly engaged in the high-pressure door-to-door sales tactics described in the complaint—to engage in the twisting scheme cannot serve as a predicate for civil conspiracy "[b]ecause agents and officers are representatives of the corporation," and "a conspiracy between officers, or between agents and the corporation, is a legal impossibility." *Id.* ("The general rule . . . is that there can be no civil conspiracy between a corporation's own officers or employees, . . . nor between a corporation and its agents."). Neither of the two exceptions to the Illinois intracorporate conspiracy doctrine apply, given the plaintiffs' allegations that Platinum sales agents were acting within the scope of their official duties when they made the misrepresentations at issue. See Third Am. Compl. at ¶ 50 (Platinum's "twisting plan/scheme was orchestrated, planned, uniform, and consistent at all levels down to the very sales agents carrying out the plan/scheme"); *compare Georgeson*, 2005 WL 1799281, at *2 (doctrine may not apply if a separately incorporated conspirator acts out of self-interest, such that its interests diverge from those of the principal corporation, or if conspirators act beyond the scope of their official duties).

That deficiency may not have been fatal[5] if the plaintiffs had plausibly alleged Medico's involvement in the alleged conspiracy—but they haven't. That Platinum and Medico entered an agreement in which Platinum would serve as a sales agent for Medico's supplemental medical insurance policies, Third Am. Compl. at ¶ 45, does not itself suggest Medico's involvement in the fraudulent twisting scheme. The plaintiffs also contend that Medico "authorized and/or directed Platinum to undertake this scheme on their behalf, and otherwise ratified it by knowingly accepting

---

[5] Setting aside the plaintiffs' allegations that Platinum and Wayne Briggs were acting as Medico's agents throughout the execution of the scheme, Third Am. Compl. at ¶ 48, Pls.' Resp. Opp'n Medico Mot. Dismiss at 6—which, of course, also implicate the intracorporate conspiracy doctrine.

and retaining revenues and other benefits derived from Platinum's deceptive sales scheme." *Id.* at ¶ 52. But there is no factual support whatsoever for that conclusory allegation—the complaint gives the Court no reason to think that Medico knew that Platinum was making misrepresentations to induce customers to purchase its supplemental insurance plans and fails to even speculatively identify the person or persons at Medico who allegedly authorized or directed Platinum to engage in this scheme on Medico's behalf. That Medico "knowingly accepted and retained revenues" from Platinum's sales is unremarkable in light of the plaintiffs' allegations that Medico and Platinum were operating under a marketing and sales agreement. And while the plaintiffs are correct that conspiracies are typically established through reliance on circumstantial evidence and common-sense knowledge of conspiratorial behavior, rather than direct proof, the allegations must plausibly suggest something more than "[a]ccidental, inadvertent, or negligent participation in a common scheme" or even "knowledge of the fraudulent or illegal actions of another," neither of which is enough to establish civil conspiracy. *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999).

Considering these shortcomings, the plaintiffs' allegations do not plausibly plead an agreement between two or more persons to accomplish the fraudulent twisting scheme described in the complaint. The plaintiffs' civil conspiracy cause of action therefore must be dismissed.

e. <u>The Plaintiffs' Negligence Per Se Claim Survives.</u>

Finally, the defendants argue that the plaintiffs' negligence per se claim fails because both Kansas and Iowa law incorporate, as an element of negligence per se, that the statutory or regulatory provision allegedly violated include an individual right of action. *See* T. Briggs & Platinum Memo. Supp. at 14. They represent that "Kansas and Iowa courts have repeatedly disclaimed the private rights of action under insurance statutes and regulations." *Id.* (collecting

cases). And they argue that only Kansas or Iowa law may govern these claims, in light of the fact that the alleged misconduct was carried out by independent contractors of an Iowa-based company in Iowa and Kansas. T. Briggs & Platinum Reply 14, ECF No. 118. Relying on case law from this court, applying Illinois state tort law, the plaintiffs respond that the "nonexistence of a private right of action under a statute does not mean that '[p]laintiffs are barred by [the statute] from bringing a state law tort claim premised on facts similar to those which might also violate [the statute.]'" Pls.' Resp. Opp'n at 15. They concede that the regulations at issue do not create private causes of action, but note that municipal traffic ordinances do not create private rights of action either; as such, they argue, "the conclusion does not follow that such ordinances cannot supply duties of care enforceable under general tort principles like negligence per se." *Id.*

Both parties miss the mark to some degree. First, the plaintiffs' cited cases from this district applying Illinois law do not rebut the defendants' arguments regarding Iowa and Kansas law, which the defendants contend should be applied. Here, as in other areas of the briefing, the parties talk past each other.[6] Second, and contrary to the defendants' representations, Iowa law does not incorporate as an element of negligence per se that the relevant statute or regulation include a private cause of action. Rather, if "a statute or regulation . . . provides a rule of conduct specifically designed for the safety and protection a certain class of persons, and a person within that class

---

[6] There is a choice-of-law question lurking in the background of almost every claim the plaintiffs raise—the parties address the dilemma in some places (or argue that their position is the correct one regardless of which state's law applies) and gloss over it in others. Where the parties do not make an argument about the substantive law that applies, the Court has defaulted to applying Illinois law. *See Selective Ins. Co. of S. Carolina v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016) ("If no party raises a choice of law issue to the district court, the federal court may simply apply the forum state's substantive law.") (internal quotations and citation omitted); *Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512, 514 (7th Cir. 1988) (recognizing a choice of law issue but concluding "[t]he parties' silence waives any challenge" to the district court's use of the forum's substantive law).

receives injuries as a proximate result of a violation of the statute or regulation, the injuries would be actionable as negligence per se" so long as the plaintiff suffered the type of harm the statute was intended to prevent, and the plaintiff was in the class of persons the statute intended to protect. *Wiersgalla v. Garrett*, 486 N.W.2d 290, 292-93 (Iowa 1992) (cleaned up); *cf. Seeman v. Liberty Mut. Ins. Co.*, 322 N.W.2d 35, 37-38 (Iowa 1982) (observing that a statutory duty or standard may establish an essential element for a negligence action, but the cause of action itself is the common law tort of negligence; whether a violation of a statutory duty gives rise to an individual cause of action in tort is a separate analysis). Nor, it seems, does Kansas, in light of the Kansas Supreme Court's decision in *Shirley v. Glass*. 308 P.3d 1 (Kan. 2013). In *Shirley*, the Kansas Supreme Court recognized that its courts had used the phrase negligence per se "inconsistently and with a variety of meanings," and that "[t]his confusion of meaning has led to a series of rules that are difficult to reconcile and equally difficult to apply." *Id.* at 5-6. But, abrogating its previous cases like *Pullen*, on which the defendants rely, the court clearly held that plaintiffs may use a defendant's violation of certain statutes, like traffic safety laws, "to support a claim of breach of duty in negligence actions . . . even when the laws do not explicitly create a private cause of action." *Id.* at 7. As a result, that the relevant Iowa and Kansas insurance statutes or regulations do not create a private cause of action for individual plaintiffs has no bearing on whether those statutes may supply a standard of care for the plaintiffs' negligence claims.

It may be that the relevant state insurance statutes or regulations do not establish a duty or standard of care on the part of insurance sales agents like Platinum, or that the regulations are not intended to protect consumers like the plaintiffs. But those issues were not briefed, so the Court does not decide them here. The defendants are wrong that an individual right of action is a

necessary element of a negligence per se cause of action under Iowa and Kansas law, however, and so the plaintiffs' negligence per se claims may proceed.

### 4. The Plaintiffs Have Adequately Plead Wayne Briggs's Direct Involvement.

Separately, Wayne Briggs moves to dismiss the claims against him because the plaintiffs have made "no allegations that he did anything wrong to any Plaintiff" and are, instead, "seek[ing] to hold Briggs liable for the action of other defendants." W. Briggs Memo. Supp. at 2. Briggs contends that the only methods by which the plaintiffs could hold him personally liable for the other defendants' alleged wrongdoing is by "(1) establish[ing] that Briggs conspired with the tortfeasors; or (2) alleg[ing] facts showing that Briggs disregarded Platinum's corporate form in a manner sufficient to justify piercing the corporate veil." *Id.* The plaintiffs respond that, under Illinois law, liability "will be imposed upon an individual who actively participates in the wrongdoing," whether directly or through assisting fraud perpetrated by others. Pls.' Resp. Opp'n 6-7, ECF No. 106.

The Court agrees with the plaintiffs that the complaint has sufficiently plead a basis for Wayne Briggs's liability in the alleged fraudulent misrepresentations and omissions—and, contrary to the defendant's assertions, they do so without relying on conspiracy or piercing the corporate veil. In their complaint, the plaintiffs allege, upon information and belief, that Wayne Briggs "personally directed and participated in the wrongful scheme," Third Am. Compl. at ¶ 18; that, after Platinum lost its contract with GTL, Wayne Briggs directed sales agents to "'flip' each and every one of GTL's policyholders to policies issued by its new underwriting partner," *id.* at ¶ 46; that that "twisting plan/scheme was orchestrated, planned, uniform, and consistent at all levels down to the very sales agents carrying out the plan/scheme," *id.* at ¶ 50; and that the "campaign of in-person visits" during which sales agents made the relevant material

misrepresentations was carried out "on the direction of Defendant W. Briggs," *id.* at ¶¶ 86, 95. This is enough to plausibly allege that Wayne Briggs is directly liable for fraud, as "[a]nyone who aids and abets a fraud is 'also guilty of the tort of fraud.'" *Fifth Third Mortg. Co. v. Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019) (under Illinois law, to state a claim for aiding and abetting, a plaintiff must allege that "1) the party whom the defendant aids performed a wrongful act causing an injury, 2) the defendant is aware of his role when he provides the assistance, and 3) the defendant knowingly and substantially assisted the violation") (internal quotations omitted); *see also Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 452-53 (7th Cir. 1982) ("Anyone who would be guilty in a criminal proceeding of aiding and abetting a fraud would be liable under tort law as a participant in the fraud."); *see also O'Leary v. Kaupas*, No. 08 C 7246, 2010 WL 4177264, at *3 (N.D. Ill. Oct. 19, 2010) (describing, as an alternative to aiding and abetting liability, a concert of action theory, which requires that the defendant did a tortious act in concert with others or pursuant to a common design; knew that others' conduct amounted to a tort and gave substantial assistance or encouragement to their behavior; or gave substantial assistance to others in accomplishing the tortious result and his own conduct independently constituted a tort). Put simply, whether the theory of liability is framed as concert of action or aiding and abetting, an individual who participates in a fraud "in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud." *E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623-24 (7th Cir. 2000). And, according to the plaintiffs' allegations, Wayne Briggs played an instrumental role in devising and overseeing the fraudulent twisting scheme carried out by his company's sales agents, as described in the complaint. At this stage, that is sufficient for the plaintiffs' surviving claims to proceed against Wayne Briggs in his individual capacity, regardless of whether he personally made any of the misrepresentations at issue.

### 5.   The Defendants' Motion to Strike the Class Allegations Is Premature.

The Briggses and Platinum also move to strike the plaintiffs' class allegations. The defendants argue that "[e]very key question in this misrepresentation case—the existence of the representations, their truth or falsity, reliance, and damages—can be answered only on an individual basis," such that the common questions (if any) do not predominate over the putative class members' individualized issues. Platinum & Briggses Memo. Supp. Mot. Strike 10, ECF No. 94. They also challenge the plaintiffs' proposed class definition and the typicality of the named plaintiffs, *see, e.g.*, *id.* at 12 (noting that plaintiff Kramer, for example, is not even a member of the putative class, which is defined as those who "held one or more GTL policies"), and maintain that a class proceeding is not a superior method of adjudicating putative class members' claims. *Id.* at 11-15. The defendants also urge this Court to dismiss for lack of subject matter jurisdiction, if the Court agrees that the class allegations should be stricken. The plaintiffs have invoked the Class Action Fairness Act, 28 U.S.C. § 1332(d), as the basis of this Court's subject matter jurisdiction over their claims, and as the defendants note, there is neither a federal question at issue nor complete diversity between the parties to otherwise serve as a jurisdictional basis authorizing this Court's adjudication of the plaintiffs' state law claims.

Rule 23 requires any class to satisfy numerosity, commonality, typicality, and adequacy requirements. Fed. R. Civ. P. 23. It also requires that a proposed class be ascertainable, *i.e.*, defined clearly and based on objective criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Moreover, when a putative class seeks money damages, the "more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions subsumes the commonality requirement of Rule 23(a)(2)." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, Nos. 05 C 4742, 05 C 2623, 2007 WL 4287511, at *6 (N.D. Ill. Dec. 4, 2007). If

these criteria are not satisfied, the proposed class cannot be certified, and "[t]he interplay of Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) empowers the Court to dismiss or strike class allegations at the pleading stage." *Murdock-Alexander v. TempsNow Emp't*, No. 16 C 5182, 2016 WL 6833961, at *3 (N.D. Ill. Nov. 21, 2016) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). A court may do so even in the absence of a motion seeking class certification; the court "need not delay a ruling on certification if it thinks that additional discovery would not be useful in resolving the class determination." *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011). However, a court should strike class allegations at the pleading stage "only where the pleadings are facially defective or inherently deficient," and, where the plaintiffs have not yet had the benefit of class discovery, the defendant "bears the burden of proving that the proposed class is not certifiable." *Dowding v. Nationwide Mut. Ins. Co.*, 490 F. Supp. 3d 1291, 1298 (N.D. Ill. 2020). And it is an "exceptional case" where the complaint is "so facially lacking that no amount of discovery or time could provide support for class status" so as to warrant striking the class allegations and "conserv[ing] court and party resources." *Jones v. BRG Sports, Inc.*, No. 18 C 7250, 2019 WL 3554374, at *3-4 (N.D. Ill. Aug. 1, 2019); *see also Murdock-Alexander*, 2016 WL 6833961, at *4 ("Striking class allegations at the pleading stage is generally inappropriate."). A court may abuse its discretion by not allowing for appropriate discovery before deciding whether to certify a class. *See, e.g.*, *Edmond v. City of Chicago*, No. 17 C 04858, 2018 WL 5994929, at *15 (N.D. Ill. Nov. 15, 2018).

The plaintiffs' complaint does not suffer from the type of facial or inherent defect that would warrant striking their class allegations at this early stage of the proceedings, without the benefit of class discovery. "The questions of superiority and predominance are uniquely difficult to resolve based on the complaint alone." *Lucas v. Vee Pak, Inc.*, 68 F. Supp. 3d 870, 884 (N.D.

Ill. 2014). Predominance, in particular, is governed by a legal standard that "evinces why a motion to strike is premature at this stage"; "when a court considers predominance, it may have to venture into the territory of a claim's merits and evaluate the nature of evidence" and "[i]n most cases, some level of discovery is essential to such an evaluation." *Murdock-Alexander*, 2016 WL 6833961, at *5. The plaintiffs concede that "proof of common representations and reliance admittedly make oral fraud claims a tougher case for class certification," Pls.' Resp. Opp'n 4, ECF No. 107, and even if the allegations are not stricken now, "[t]he plaintiffs will have to overcome all of Rule 23's hurdles in order to warrant class certification." *Lucas,* 68 F. Supp. 3d at 884. But the arguments the defendants raise are enmeshed with the factual and legal merits of the plaintiffs' class allegations and, as such, are most appropriately addressed through a motion for class certification after appropriate discovery. At this stage, the complaint "do[es] not demonstrate any irremediable defect that requires denial of class certification as a matter of law." *Id.*

*       *       *

Defendant Guarantee Trust Life Insurance Company's motion to dismiss for failure to state a claim [83] and defendant Medico Corp Life Insurance Company's motion to dismiss for lack of personal jurisdiction [85] are both granted. The motions to dismiss by Tyler Briggs, Wayne Briggs, and Platinum Supplemental Insurance, [86], [90] are granted in part and denied in part. First, the named plaintiffs all have standing to pursue their claims and have adequately plead damages for their fraud- and misrepresentation-based causes of action. Second, the plaintiffs' negligence per se claim is adequately plead. Third, the plaintiffs have failed to plausibly state a claim for tortious interference with contract, civil conspiracy, or violations of the Illinois Consumer Fraud and Deceptive Business Practices Act or Financial Exploitation of an Elderly Person Act. Leave to

amend, consistent with this ruling and Rule 11, is granted. Finally, the defendants' motion to strike the class allegations [93] is denied.

Dated: July 22, 2021

John J. Tharp, Jr.
United States District Judge